# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1664

_____

Midwestern Machinery Co., Inc.; Brian    *
F. Gagan; Sharon Tolbert Glover;    *
Charles M. Koosmann; Laurie I.    *
Laner; Jack Reuler; Nigel Linden;    *
Daniel L. Jongeling; Industrial Rubber    *
Products, Inc.; Daniel O. Burkes,    *    Appeal from the United States
   *    District Court for the District of
       Appellants,    *    Minnesota.
   *
     v.    *
   *
Northwest Airlines, Inc.,    *
   *
       Appellee.    *

_____

Submitted: February 13, 2004
Filed: December 7, 2004

_____

Before MORRIS SHEPPARD ARNOLD, JOHN R. GIBSON, and RILEY, Circuit
     Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The plaintiffs (referred to collectively as Midwestern) appeal from a summary judgment entered against them in their action against Northwest Airlines under § 7 of the Clayton Act, *see* 15 U.S.C. § 18. For the reasons stated below, we affirm the judgment of the district court.[1]

I.

Northwest Airlines merged with Republic Airlines in 1986. Before the merger, Northwest was the eighth largest airline in the United States, and Republic was the ninth largest. Both had a significant presence at the Minneapolis-St. Paul Airport (MSP). The merger was sanctioned by the Department of Transportation but was not granted antitrust immunity.

In 1997, eleven years after the merger, Midwestern filed suit claiming that the merger violated § 7 of the Clayton Act. The district court dismissed the complaint, holding that the merger could not be the subject of a § 7 claim because the acquired entity's stock had ceased to exist. We reversed that dismissal in *Midwestern Machinery, Inc. v. Northwest Airlines, Inc.*, 167 F.3d 439 (8th Cir. 1999). On remand, the district court allowed Midwestern to certify a class of plaintiffs, but notification of the class was postponed while the district court considered Northwest's motion for summary judgment on the ground that the statute of limitations had run. When the district court granted the motion, Midwestern appealed.

Section 7 of the Clayton Act prohibits acquisitions that serve "substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, and contains a four-year statute of limitations for private actions, 15 U.S.C. § 15b. Section 7 exists primarily to arrest, at their incipiency, mergers that could produce anti-competitive

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

results. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000), *cert. denied*, 531 U.S. 979 (2000). Generally, a "Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition." *Id.* Midwestern maintains, however, that there are three reasons why its suit, though it was filed eleven years after the merger, nevertheless survives Northwest's motion for summary judgment on limitations grounds. Midwestern also argues that its action is not barred by laches.

## II.

Midwestern asserts first that Northwest's "continuing violations" of the Clayton Act will allow it to avoid the bar of the statute of limitations. Specifically, it points to Northwest's "hub premium" for flights through its MSP hub and Northwest's actions to prevent successful entry into MSP by low-cost carriers as overt acts that restart the statute.

Under the so-called continuing-violation theory " 'each overt act that is part of the violation and that injures the plaintiff ... starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.' " *Klehr v. A. O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 338b (rev. ed. 1995)). Midwestern, however, cites no appellate decisions applying this principle to § 7 claims. Rather, it attempts to analogize this case to other areas of antitrust law where such a theory has in fact been recognized.

The typical antitrust continuing violation occurs in a price-fixing conspiracy, actionable under § 1 of the Sherman Act, *see* 15 U.S.C. § 1, when conspirators continue to meet to fine-tune their cartel agreement. *See Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 815 F.2d 270, 278 (3d Cir. 1987), *cert. denied*, 484 U.S. 851 (1987). These meetings are overt acts that begin a new statute of limitations

because they serve to further the objectives of the conspiracy. *Cf. Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971).

But "[c]ontinuing violations have not been found outside the RICO or Sherman Act conspiracy context ... because acts that 'simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations.' " *Concord Boat*, 207 F.3d at 1052 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467-68 (6th Cir. 1996) (citations and internal quotations omitted)). In other words, to apply the continuing violation theory to non-conspiratorial conduct, new overt acts must be more than the unabated inertial consequences of the initial violation.

Looking at how courts have applied the continuing violation theory to claims brought under § 2 of the Sherman Act sheds light on why that theory does not apply to Clayton Act claims. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 483-84 (1968), United, a manufacturer and distributor of shoe machinery, was sued by one of its customers, Hanover, for monopolizing the shoe machinery industry in violation of § 2 of the Sherman Act. United leased but refused to sell its machinery to Hanover, causing Hanover to pay more for use of the machines over time. United's lease-only policy first adversely affected Hanover in 1912, but suit was not filed until 1955. The Court held that United's continued adherence to the policy was part of its maintenance of its monopoly. The Court stated:

> We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. ... Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

392 U.S. at 502 n.15. The Court thus endorsed the Third Circuit's reasoning that United's conduct "went beyond a mere continuation of the refusal to sell; it collected rentals on leases and entered into new leases when old machinery was no longer in working condition and required replacement." *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 377 F.2d 776, 794 (3d Cir. 1967), *aff'd in part and rev'd in part*, 392 U.S. 481 (1968).

While United engaged in a continuing violation by actively using the lease-only policy to maintain its monopoly, *cf. National Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 513-14 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 825 (1984), the statute of limitations begins to run from the initial violation where defendants are accused of attempting to monopolize by passively implementing anti-competitive policies, such as a refusal to deal, *see Garelick v. Goerlich's, Inc.*, 323 F.2d 854, 856 (6th Cir. 1963) (per curiam), or maintaining an action to enforce a restrictive covenant, *see Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 236-37 (9th Cir. 1987). Existing competitors must act when a rival initiates anti-competitive policies that do not require additional anti-competitive action to implement. *See* 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 320c4 (2d ed. 2000). In such circumstances, implementation is only a reaffirmation of the policy's adoption, and the statute begins to run as soon as the competitor suffers injury. *DXS*, 100 F.3d at 467-68; *see also Concord Boat*, 207 F.3d at 1051 (citing *Klehr*, 521 U.S. at 190-91).

Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing violation theory apply. This distinction between "new and independent act[s] [that] inflict new and accumulating injury on the plaintiff" (which restart the statute of limitations), *Pace*, 813 F.2d at 238, and unabated inertial consequences of previous acts (which do not) allows the statute of limitations to have effect and discourages private parties from sleeping on their rights.

Applying this rationale to mergers makes no sense. If the initial violation was the merger itself, none of the "continuing violations" Midwestern alleges can justify restarting the statute of limitations because these acts were not undertaken to further an illegal policy of merger or to maintain the merger. Otherwise, every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged. Once the merger is completed, the plan to merge is completed and no overt acts can be undertaken to further that plan.

Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme. A continuing violation theory based on overt acts that further the objectives of an antitrust conspiracy in violation of § 1 of the Sherman Act or that are designed to promote a monopoly in violation of § 2 of that act cannot apply to mergers under § 7 of the Clayton Act. Even if the initial merger violated § 7, it makes little sense to hold that policies were pursued to effectuate the illegal merger as we might in a case involving a conspiracy violating § 1 (e.g., cartel meetings occurred to effectuate a price-fixing agreement) or a case violating § 2 (e.g., ongoing policy of predatory pricing undertaken to effectuate monopolization). Once a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years.

Midwestern alleges that Northwest increased the hub premium for MSP and prevented entry by low-cost carriers into MSP by changing prices and schedules and offering rewards to passengers and travel agents. A continuing violation theory based on these alleged overt acts, however, could not justify extending the statute even if we believed that such a theory could ever apply to § 7. That is because, even if the initial merger violated § 7, these allegations are not acts furthering the objectives of the merger. They may be acts that violate other antitrust laws, but they are not continuing violations of the Clayton Act sufficient to restart the statute of limitations.

-6-

Even if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger. Conducting business is presupposed by the merger itself. Selling goods and services and responding to potential competition by lowering prices (aside from predatory pricing practices that may violate § 2 of the Sherman Act) or increasing product quality are the very things that competitive firms, merged or not, are encouraged to do to provide consumers with high quality products at the lowest prices.

Midwestern's theory would expose merged firms to potential liability in private suits as long as the firm remained merged because, assuming that the initial merger violated the Clayton Act, every subsequent action by the merged firm would be a continuing violation designed to maintain the merged firm's viability. Merged companies do face a higher susceptibility to private suits than non-merged firms, but only for the four years following the merger, absent some other justification for tolling the statute of limitations.

Congress did not prohibit all mergers in the Clayton Act because to do so would preclude the consumer benefits that mergers can generate. Admittedly, a pro-competitive merger and an anti-competitive one are hard to discern from each other, but exposing a firm to perpetual liability under the Clayton Act simply because its business history includes a merger would chill pro-competitive business combinations. Finding that a continuing violation theory does not apply to § 7 does not give a "green light" to monopolists, as Midwestern claims, because merged firms, like all firms, are still subject to the Sherman Act's prohibitions on monopolization or attempts to monopolize.

Finally, it is worth noting that because private suits under the antitrust laws are allowed to correct public wrongs, it is appropriate to encourage suits as soon as possible to stop (or at least compensate) harm to the public. Mergers occur in the

public eye and at a reasonably certain date. It is undisputed that Midwestern was well aware of its potential injury when Northwest and Republic merged. While a plaintiff need not be unaware of an initial act's illegality for the continuing violation theory to be available to extend the statute of limitations in a Sherman Act claim, it is worth noting that, unlike mergers (including the Northwest-Republic merger), initial violations of the Sherman Act usually occur in secret. In practice, where the plaintiff had actual knowledge of the initial violation and suffered sufficient injury, courts generally do not toll the statute of limitations based on a continuing violation theory. 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 320c1 at 210-11 (2d ed. 2000).

III.

Midwestern's holding-and-use theory is more firmly rooted in precedent. "Clayton Act claims are not limited to challenging the initial acquisition of stocks or assets ... since 'holding as well as obtaining assets' is potentially violative of section 7." *Concord Boat*, 207 F.3d at 1050 (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240 (1975)). But since holding and using assets acquired in a merger in the same manner as they were used at the time of the merger is merely an unabated inertial consequence of the merger, *Concord Boat*, 207 F.3d at 1052, only different uses of assets can justify restarting the statute of limitations. Midwestern relies on *United States v. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), and *ITT* to support its application of the holding-and-use theory in the present circumstances.

In *du Pont*, 353 U.S. at 588, 598-99, although the defendants had acquired a twenty-three percent stock interest in General Motors by 1919, it was not until decades later that du Pont's status as GM's supplier of automotive finishes and fabrics threatened competition. There was no realistic threat of anti-competitive behavior at the time of the acquisition. *Id.* at 598-99. Since the government (unlike private individuals) did not face a statute of limitations when it initiated action under the Clayton Act, *du Pont* did not concern a statute of limitations issue; the case was about

whether an acquisition that did not violate § 7 at the time that it occurred could be the basis for a later suit. *Id*. at 597-98. The Supreme Court held that the acquisition need violate § 7 only at the time of the suit for the government to sue; it may bring an "action at any time when a threat of the prohibited effects is evident." *See id.* The Court in *du Pont* did not address the question of whether a merger that violated § 7 at the time that it occurred could be the basis of a private suit more than four years after that merger based on the holding and use of acquired assets. The Court held only that the theory could be sufficient for a government-initiated suit at the time that competition was threatened. *Id.*

Midwestern has presented no evidence tending to show why it would not have perceived Northwest's acquisition of Republic as anti-competitive in 1986. Nor has it produced evidence that the anti-competitive threat appeared only after July 1993 (four years before it filed this suit). Unlike *du Pont*, it was clear at the time of the merger here that the combination of Northwest and Republic could lessen competition. In *du Pont*, there was no violation until decades later when GM became a successful and dominant firm and du Pont's supply relationship with GM became one based on stock ownership rather than competition among suppliers. That was not the case here. Popular press accounts from 1986 show that it was well understood that the merger of Northwest and Republic would produce increased concentration at MSP.

*ITT* is not useful to Midwestern because it, too, did not concern a statute of limitations. In that case, ITT and the Federal Trade Commission had entered into a consent order for ITT's alleged violations of the Clayton Act and the Federal Trade Commission Act. 420 U.S. at 227. The order prohibited ITT from acquiring any other bakeries for ten years, and ITT violated the order. *Id.* at 228-29. The case before the Supreme Court concerned the amount of damages ITT owed for violating the order. The Court interpreted "acquiring" as used in the consent order as prohibiting ITT's continued holding of the bakeries acquired in violation of the order,

and thus held that ITT was continually violating the order until the bakeries were divested. In dicta, the Supreme Court stated that " 'acquisition' as used in § 7 of the [Clayton] Act means holding as well as obtaining assets. ... [T]he framers of the Act did not regard the terms 'acquire' and 'acquisition' as unambiguously banning only the initial transaction of acquisition; rather they read the ban against 'acquisition' to include a ban against holding certain assets." *Id.* at 240-41. *ITT*, however, was not about the statute of limitations but about penalties. *ITT* also concerned the authority of the FTC, not private parties. *Id.* This case can only assuredly be said to stand for the proposition that, with respect to penalties for violations of consent orders, holding prohibited assets (and not just obtaining them) continues to trigger penalties until the violations of the consent order are corrected. 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 320c5 (2d ed. 2000).

Even reading these cases broadly to support the applicability of the holding-and-use theory to private § 7 claims, as Midwestern urges, the statute of limitations must begin to run at some point in order for the time bar to have any effect and to give repose to merged firms. If assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff, he or she has four years from the time that the injury occurs to sue, *see Klehr*, 521 U.S. at 188; *Zenith Radio*, 401 U.S. at 338.

Even assuming that the holding and use of assets can be a valid justification for extending the statute of limitations in a private Clayton Act suit, Midwestern's arguments fail because its assertion that market power acquired by Northwest via the merger is such an asset is logically flawed.

First, market power cannot be an asset for purposes of the Clayton Act if the statute of limitations is to have any effect. Otherwise, the holding-and-use theory would swallow the time bar. Market power is defined as "the ability of a firm ... to raise price above the competitive level without losing so many sales so rapidly that

the price increase is unprofitable and must be rescinded." William A. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 937 (1981). All horizontal mergers lead to increased market share and, with that, increased market power: Post-merger sales, even those made through market domination, are not independent acts. They are merely reaffirmations of the original merger. Horizontal mergers, by definition, increase the size and enhance the market power of the resulting firm. "Section 7 of the Clayton Act ... requires proof of market power; in fact, the main purpose of section 7 is to limit mergers that increase market power." *Id.* (footnote omitted). If market power could be considered an asset the retention of which violated the Clayton Act and required extending the statute of limitations until the market power asset was disgorged (ignoring the impossibility of divesting a firm of only its market power), the statute of limitations would have no effect. By definition, any merger that created market power would violate the Clayton Act forever as long as the firm maintained its market position. Additionally, market power, unlike other assets under the Clayton Act, cannot be traded, sold, or bought absent the trade, sale, or purchase of other assets. Market power is not itself an asset, but is the result of combinations of other assets that the firm holds.

Second, even if market power could be considered an asset, it was not exchanged in the merger; rather, the merger created the market power. The holding-and-use theory allows a statute of limitations to be tolled only when an asset is used differently after a merger from the way that it was being used before a merger. If the asset did not exist before the merger, logic requires that this theory cannot apply. If market power could be an acquired asset for Clayton Act purposes, so would economies of scale and other size efficiencies gained from the combination of two firms in a merger. To hold that the holding-and-use theory operated for these "assets," however, would subject even the most pro-competitive mergers to perpetual liability. This cannot be.

-11-

Even if we consider market power to be an asset that was exchanged in the merger, rather than being created by it, there is no evidence in this case that it is being used differently. Midwestern asserts that Northwest's business strategy changed significantly in the last half of 1993. The evidence presented and the experts' reports, however, do not support that assertion. Some of the experts looked only at Northwest's activity after the suit was filed in 1993, and others did not show any difference between Northwest's use of market power before the merger and beginning in 1993. In order to toll the statute of limitations based on holding and using market power, Midwestern must demonstrate at what point it was first injured by Northwest's differing use of market power. It is at that point that the statute of limitations begins to run. It has not done that; it merely asserts a change.

It is clear law that a nonmovant cannot survive a summary judgment motion merely by resting on its pleadings as Midwestern attempts to do here. Discovery in this case was sufficient for Midwestern to provide evidence, if it exists, that Northwest's use of market power changed. Three time periods are of relevance here: the pre-merger period; 1986 (the year of the merger) to 1993 (four years before suit was filed); and 1993 to the present. To prevail against Northwest's summary judgment motion on the basis of the holding-and-use theory, Midwestern must show that Northwest's use of market power during the first two periods was the same while only during the third period was the market power used in a new fashion. Midwestern, however, has provided no information about Northwest's use of market power before the merger. Without this information, we cannot know whether its post-1993 use of market power differed significantly from its pre-merger use.

Midwestern also suggests that market innovations such as the pricing program that Northwest employed after 1993 exemplify its different use of market power. Such a theory, however, would preclude merged firms from responding to changes in market conditions and opportunities. This makes scant sense.

Midwestern's briefs note that the holding-and-use theory is related to their continuing violation theory, while Northwest's briefs argue that the two theories are the same. While both theories, if accepted for § 7 actions, would allow a private litigant to sue more than four years after the initial acquisition, we suggest that both parties are incorrect. Under the holding-and-use theory, the claim must arise from an injury *different from* the injury caused by the initial acquisition. Where the injury was sustained at the time of the acquisition, "the limitations period ... cannot be extended on the basis of the holding and use of the acquisitions." *Concord Boat*, 207 F.3d at 1051. In contrast, a continuing violation theory is based on an initial action that violates the antitrust laws followed by injuries caused by illegal actions *designed to implement and effectuate* the initial violation. Holding and using assets restarts the statute of limitations only when the use of the assets differs after the merger, while continuing violations restart the statute of limitations when there is an ongoing scheme, such as a price-fixing conspiracy or an attempt to monopolize.

IV.

"The limitations period ... starts to run at 'the point the act first causes injury.' " *Concord Boat*, 207 F.3d at 1051 (quoting *Klehr*, 521 U.S. at 190-91). "The statute can be tolled under certain circumstances, such as ... where a plaintiff's damages are only speculative during the limitations period." *Concord Boat*, 207 F.3d at 1051.

Midwestern argues that the statute of limitations should be tolled here because the plaintiffs' future damages were speculative during the initial limitations period ending in 1990. In *Zenith Radio*, 401 U.S. at 338-42, the Supreme Court tolled the statute of limitations in a Sherman Act case because if suit had been filed during the limitations period the existence of the claimant's future damages would have been speculative because they would have been based on a hypothetically free market and on the market share that the claimant would have enjoyed were it not for a conspiracy among its competitors. The Court stated that "refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued ... In these

-13-

instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered." *Id.* at 339. The plaintiffs in *Zenith Radio* could not have avoided incurring the future damages even if they had filed suit during the limitations period.

Midwestern does not claim that if it had filed suit within the four-year statute of limitations period it could not have calculated any of the damages that it had suffered. Instead, it argues that it should be allowed to restart the statute of limitations because it could not forecast future damages at that time. In 1990, Midwestern could have established its injury but could not have precisely calculated the scope and extent of the future damages it would suffer due to the Northwest-Republic merger. If it had filed suit by 1990 and won equitable relief on the merits, however, it would have incurred no future damages. Unlike the plaintiffs in *Zenith Radio*, Midwestern could have precluded future damages from occurring by obtaining within four years of the merger the injunctive relief that it now seeks or possibly divestiture.

Injuries caused by a merger, of course, might not materialize until after the four-year limitation period has expired. In that case, the plaintiff has not been injured yet, and the statute of limitations does not begin to run until the plaintiff suffers injury. *See Concord Boat*, 207 F.3d at 1051. But where the plaintiff's injury is immediate (as Midwestern's was according to the class representatives) the statute of limitations begins to run at that time. The limitations period begins when "present or future damages became definite enough to support a recovery." 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 320d (2d ed. 2000). The total extent of the alleged damages, including future damages, was unknown at that time, but damages that could be claimed existed. Midwestern, had it filed suit during the four years following the merger, would have been able to recover the damages it had already suffered if the court found that Northwest's merger with Republic violated the Clayton Act. The scope and extent of Midwestern's future damages may have been

-14-

speculative, but the fact that it had suffered a quantifiable injury was not. *See Pace*, 813 F.2d at 240 (analyzing *Zenith Radio*).

Refusing to extend the statute of limitations in this case ensures that the statute continues to have meaning. We cannot imagine a Clayton Act claim (which means, by definition, that the plaintiffs allege that an acquisition has lessened competition and injured them) that could not be filed more than four years after the acquisition were we to hold that the unascertainable scope and extent of future damages was sufficient to warrant tolling the statute. In merger cases where monopolization by the merged firm is intimated, as it was here, future damages to be borne by consumers will always be speculative as long as the merged firm exists.

This holding does not mean, however, that Midwestern was without recourse for damages that it suffered after 1990. If, in an action filed within the statute of limitations period, Midwestern had proved antitrust injury stemming from the alleged Clayton Act violation, the court could have provided Midwestern with equitable relief that would have precluded the post-1990 damages, including the damages that it now seeks. And if Northwest's actions constituted violations of other antitrust laws, such as § 2 of the Sherman Act, Midwestern would have had a new and separate cause of action with a four-year statute of limitations from the time that the allegedly illegal activity occurred.

V.

In addition to seeking damages, Midwestern sought injunctive relief. *See* 15 U.S.C. § 26. It asked the court to order changes in Northwest's policies at MSP, including limiting the number of gates leased by Northwest, requiring Northwest to provide equipment and services to low-cost carriers, requiring Northwest to establish or allow interline or "code sharing" relationships with low-cost carriers (allowing low-cost carriers to sell seats on Northwest's regional feeder airlines), limiting the extent to which Northwest could engage in short-term profit-sacrificing activities,

-15-

requiring Northwest to adjust its frequent flyer program, and requiring Northwest to adjust its travel agent compensation program.

Northwest, as part of its summary judgment motion, asserted that the equitable relief sought was barred by the doctrine of laches, which requires a showing that the plaintiff was "guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Goodman v. McDonnell Douglas, Corp.*, 606 F.2d 800, 804 (8th Cir. 1979); *cf. IT&T v. General Tel. & Elec. Corp.*, 518 F.2d 913, 926-27 (9th Cir. 1975), *overruled on other grounds*, *California v. American Stores Co.*, 495 U.S. 271 (1990). "The doctrine of laches is premised upon the same principles that underlie statutes of limitations: the desire to avoid unfairness that can result from the prosecution of stale claims." *Goodman*, 606 F.2d at 805. Whether a statute of limitations would bar a comparable action at law is one consideration in "determining whether the length of delay was unreasonable and whether the potential for prejudice was great," *id.*, and we have already held, of course, that Midwestern's damages claims are barred by the four-year statute of limitations.

In addition, Midwestern produced no reasonable justification for the eleven-year delay in filing suit. Northwest did nothing to conceal the merger from Midwestern or to dissuade it from filing suit in a timely manner. Class representatives stated that, during the four years following the much-publicized merger, they did not file suit because they were too busy, too concerned about the costs of litigation, or ignorant about their cause of action. If these reasons were sufficient to justify denying a laches defense when the comparable statute of limitations time period has run more than twice over, the notion of laches would be rendered meaningless.

Beyond the long-since expired statute of limitations in this case and the lack of a justification from Midwestern to explain the delay, Northwest would be substantially prejudiced were equitable relief to be granted at this late date. In 1989,

Northwest's corporate parent ceased to be a public corporation and became a privately-held company. In 1994 (after the four-year statute of limitations on the merger had run), the corporation again became publicly traded. The current shareholders of Northwest who invested in 1994 or after had no reason to believe that a merger occurring more than seven years earlier could be the basis for suit. Northwest's shareholders would be unduly prejudiced were this claim for equitable relief allowed to proceed.

Midwestern slumbered on its rights, and its equitable claims are now barred. As stated before, however, if Northwest is violating other antitrust statutes through its current practices, Midwestern could seek the same injunctive relief to remedy those violations as it seeks here. In fact, the equitable relief sought here would find a more hospitable home in a suit for a violation of § 2 of the Sherman Act than in an action for a violation of § 7 of the Clayton Act, in which the usual remedy is the divestiture of acquired stock or assets.

## VI.

If, following its merger with Republic Airlines, Northwest has acted in a predatory manner, it could be liable under the Sherman Act. We are loath, however, to expose merged companies forever to private litigation under the Clayton Act, which, as Midwestern admits, presents a lower threshold for liability than does the Sherman Act. Non-merged competitors would not be susceptible to these suits. And given that Congress has implicitly sanctioned merger activities where merged firms are believed to promote economic efficiency, opening up the statute of limitations for merged firms forever based solely on the potential effects that they may have on competition would overly burden these firms. The four-year statute of limitations is designed to allow private parties to assess whether the new merged firm is actually enhancing efficiency or lessening competition. After that period, without some other evidence of a different use of assets acquired from the merger, the Clayton Act's statute of limitations has run, and the only private antitrust actions that remain will

lie under the Sherman Act, the same vehicle open to potential suits against all firms, merged or not.

We therefore affirm the judgment of the district court.

JOHN R. GIBSON, Circuit Judge, dissenting.

Midwestern Machinery contends that, beginning in the second half of 1993, Northwest deliberately and dramatically changed its use of a key asset (or bundle of assets) it obtained from Republic–its Minneapolis hub–and began to exploit that asset to lessen competition in a way that injured Midwestern Machinery. Both the district court and this Court have disposed of a factual issue, supported by expert reports, independent studies, and statistical evidence, on summary judgment. Neither court fulfills the duty to judge a summary judgment motion "viewing the evidence and drawing all inferences in the light most favorable to the party opposing the motion." See Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1096 (8th Cir. 2002). Accordingly, I respectfully dissent.

The district court disposed of Midwestern Machinery's hub exploitation argument in one sentence: "Specifically, Plaintiffs assert that the 1993 spike in Northwest's hub fare premium constitutes a new overt act of anti-competition; however, Plaintiff's own experts point to a number of factors that might have contributed to the increase in hub fare premiums, none of which involves new or different uses of the merger assets." Slip op. at 5 (emphasis added). The Court today devotes three sentences to the hub exploitation argument: "Midwestern also suggests that market innovations such as the pricing program that Northwest employed after 1993 exemplify its different use of market power. Such a theory, however, would preclude merged firms from responding to changes in market conditions and opportunities. This makes scant sense." Supra at 12.

Both the district court and this Court thus resolved the hub exploitation argument without addressing the considerable body of evidence supporting Midwestern Machinery's assertions. The district court did so by requiring the plaintiff's evidence to rule out the existence of influences which <u>might have contributed</u> to the change in prices that experts and independent scholars say resulted from Northwest's exploitation of the "fortress hub" it acquired in the merger. Our Court does so by a naked policy judgment–that punishing firms for responding to changes in market conditions and opportunities is intolerable–apparently without regard to whether such responses violate the Clayton Act.

Midwestern Machinery's experts arrayed evidence that would allow a finder of fact to arrive at the following conclusions:

(1) Before the merger with Republic, Northwest did not have dominance over the Minneapolis airport, but competed with Republic.[2]

---

[2]The expert report of John C. Beyer concerning statute of limitations issues stated:

> Before their merger, Northwest and Republic were, respectively, the eighth and ninth largest airlines in the United States. Both firms had substantial operations at the Minneapolis/ St. Paul airport ("MSP") and were, by far, the largest airlines serving MSP. The firms competed with one another for passengers on the routes in which they overlapped. And, each firm constrained the ability of the other to charge supracompetitive prices on the routes in which they did not overlap because each could readily adjust their flight schedules and operations to take advantage of a profit opportunity on city-pair routes they were not serving at the time.

App. 20.

(2)  After the merger, the new Northwest controlled around 75% of the gates at the Minneapolis airport,[3] carried 79% of Minneapolis passengers,[4] and became the only carrier serving 19 routes out of Minneapolis.[5]

(3)  Market power results from a highly concentrated market or high market share, combined with barriers to entry of that market by competitors.[6]

(4)  Control of airport gates is an important entry barrier to new entrants at some airports, and in particular, at the Minneapolis airport.[7]

---

[3]At the time of the merger, the financial press reported that the merger would result in Northwest controlling 75-80% of the gates at Minneapolis. Lee A. Ohanian Report, App. 157.  See also General Accounting Office, Airline Deregulation: Barriers to Entry Continue to Limit Competition in Several Key Domestic Markets 10 (Oct. 18, 1996) (showing 49 out of 65 gates at Minneapolis had been leased to Northwest).

[4]Minnesota Planning, Flight Plan: Airline Competition in Minnesota 3 (1999).

[5]Ohanian Report, App. 156-57 (quoting Dep't of Justice Report: "In 19 of [the 26 markets out of Minneapolis where Northwest and Republic provided most of the service] the merger would consolidate the only two airlines providing nonstop service, thereby eliminating all present competition.").

[6]Beyer Report, App. 22 ("Where a concentrated market is coupled with barriers to entry . . . one can infer the possession of market power by the dominant firm."); Ohanian Report, App. 152 ("Market power requires a high market share and barriers to entry into the market.").

[7]Beyer Report, App. 22; General Accounting Office, Airline Deregulation: Barriers to Entry, supra, at 9-11 (senior management at many start-up airlines said long-term, exclusive gate leases are barrier to entry at Minneapolis; showing 49 out of 65 gates at Minneapolis had been leased to Northwest; "The airports in Detroit, Newark, and Minneapolis were most frequently cited by the airlines that started after deregulation as having competition limited by constraints in gaining access to gates"; requirement of subleasing gates to gain entry to Minneapolis was "key factor" in Southwest's decision not to serve Minneapolis); Ohanian Report, App. 153 ("A key barrier to entry in the airline market is access to gates.").  A General Accounting

(5) Possession of a "fortress hub" dominated by one carrier[8] can create an entry barrier by giving the dominant carrier a frequency-of-flights advantage that puts new entrants at a competitive disadvantage[9] and by locking in customers and travel agents through frequent flyer and "frequent booker" programs.[10]

(6) General economic conditions and Northwest's own financial situation prevented it from effectively exploiting its market power until 1993.[11]

(7) Beginning in the second half of 1993, there was a great leap in Northwest's exploitation of its market power at Minneapolis, as demonstrated by its greatly

---

Office report from 1999 stated that all gates at Minneapolis were subject to exclusive-use leases and that Northwest leased 54 of the 70 gates; airport officials stated that there were "no gates available" to new entrants. General Accounting Office, Airline Dergulation: Changes in Airfares, Service Quality, and Barriers to Entry 17 (March 4, 1999). See also Minnesota Planning, supra, at 3 ("The U.S. General Accounting Office found in 1996 that long-term, exclusive-use gate leases seriously inhibit competition at Minneapolis-St. Paul. At airports where most gates are tied up in such leases, new entrants are often forced to sublease gates, which usually results in gate access at less desirable times and higher cost.")

[8]The term "fortress hub" is used in the airline industry to describe hubs in which one carrier has a dominant share of flights or services. John S. Strong Report, App. 202 n.8.

[9]"[S]tudies have shown that a carrier with a frequency advantage in a market gains a disparate share of local traffic, which compounds the competitive problem for other carriers that compete at the network hub. When carriers with similar cost characteristics do not have access to the same traffic flows, they are unable to compete." Department of Transportation, Office of Aviation and International Economics, The Low Cost Airline Service Revolution 27 (April 1996).

[10]Severin Borenstein, Hub Dominance and Pricing 4-5 (1999).

[11]Ohanian Report, App. 170-71; Ohanian Rebuttal Report, App. 194-95.

increased supra-competitive profit margins or "hub premiums."[12]  This increase in premiums corresponded with a new strategy by Northwest to reduce the sphere in which it competed and concentrate on its fortress hubs.[13]

(8)  Also beginning in 1993, Northwest responded to a new problem–the upsurge of low-fare new entrant airlines–by various strategies that involved exploitation of its fortress hub at Minneapolis.[14]

These propositions, which are supported by expert opinions backed up by data and academic and governmental studies, suffice to show that beginning within the four-year limitations period, Northwest made a new use of assets gained in the merger to stifle competition and reap monopoly profits.  Midwestern Machinery's claim

---

[12]Beyer Report, App. 26-27 ("The increase in Northwest's [Minneapolis] hub premium from 21 percent in 1993 to 46 percent in 1994 is substantial. . . . The substantial increase in Northwest's [Minneapolis] hub premium between 1993 and 1994 indicates that Northwest changed the way in which it was exercising its monopoly power. . . . Northwest's [Minneapolis] hub premium increased so significantly because Northwest appears to have changed the way in which seats on its airplanes were allocated amongst the various fare classes."); Ohanian Report, App. 166 (contrasting fare premium charged by Northwest on Minneapolis flights in 1993 (21%) with that charged in 1994-97 (40.3%)).; Dep't of Transportation, Low Cost Airline Revolution, supra, at 29 (comparing hub fare premiums at Minneapolis for 1988 (23%) and for 1995 (40.8%)); Ohanian Report, App. 169 (showing that Northwest's profit margin for twenty major Minneapolis markets went from 0.9% in the first quarter of 1993 to 15.5% in 1994-97); "[B]y the third quarter of 1998, travelers using [the Minneapolis] airport were paying the third highest fares in the nation." Paul Stephen Dempsey, Predatory Practices and Monopolization in the Airline Industry: A Case Study of Minneapolis/ St. Paul, 29 Transp. L. J. 129, 131 (2000). But cf. Minnesota Planning, supra, at 7 ("Borenstein's analysis shows that fare premiums paid by Northwest customers in Minneapolis-St. Paul increased dramatically between 1989 and 1990, and have remained high since then.").

[13]See discussion infra at 8-9.

[14]Strong Report, App. 201-38, discussed in detail, infra, at n.25.

should survive summary judgment under the Clayton Act standards articulated in an earlier stage of this case, <u>Midwestern Machinery, Inc. v. Northwest Airlines, Inc.</u>, 167 F.3d 439, 442-43 (8th Cir. 1999), and in <u>Concord Boat Corp. v. Brunswick Corp.</u>, 207 F.3d 1039, 1050-51 (8th Cir. 2000).

The Court today does not repudiate or gainsay the legal standards set out in <u>Midwestern Machinery</u> and <u>Concord Boat</u>, that a cause of action for holding and use of merger assets accrues when the threat of restraint or monopoly first becomes evident and the plaintiff suffers injury thereby.  <u>Midwestern Machinery</u>, 167 F.3d at 443; <u>Concord Boat</u>, 207 F.3d at 1051.  The Court states, "[O]nly different uses of assets can justify restarting the statute of limitations."  <u>Supra</u> at 8.[15]  Accordingly, I have no need to argue about legal standards.  Instead, my concern is with the Court's treatment of the facts.  The Court says that plaintiffs did not adduce evidence of the facts alleged.  In particular, the Court says that the plaintiffs did not show that they used assets gained in the merger to threaten competition and that they did not show they used the assets differently during the limitations period (1993 and after) than they did during the preceding, time-barred period.  The Court can only reach these conclusions by ignoring a great deal of evidence to the contrary.

---

[15]<u>Compare</u> II Phillip Areeda, Herbert Hovencamp, & Roger Blair, <u>Antitrust Law</u> § 320c5 (2d ed. 2000) ("[A] continuing violation occurs when the defendant uses the merger in a way that is not inherent in the acquisition itself.  For example, suppose that a merger gave a firm the structural power to engage in predatory pricing.  A damages action challenging such a merger would fail as long as predation were merely possible or even likely.  As a result, the statute of limitation would not run on such a damage claim.  However, once unlawful predation began and the plaintiff could show the merger facilitated the predation, then the statute of limitation would not bar a challenge to the merger itself . . .").  Whether the distinctive use is referred to as a continuing violation or different holding and use, the idea is the same.

First, the Court says that market power is not an asset, but the result of possession of other assets. Supra at 11. Northwest's experts did opine that Northwest gained market power as a result of the merger, but they made it clear that the market power came from assets acquired in the merger, such as Republic's gate leases at the Minneapolis airport.[16] When the plaintiffs' economists use the term "market power" in this case, they use it as a proxy for the constellation of assets such as gate leases that make up a "fortress hub." Therefore, we need not worry about whether market power is itself an asset, since it results from control of property and rights that are indubitably assets. The Court's point goes only to the words used, not to the substance of what the plaintiffs' evidence showed.

Second, the Court says that the plaintiffs did not show that they made a distinctive use of the assets during the limitations period that differed from their use of the assets during the time-barred period. But the plaintiffs did show this. The plaintiffs introduced evidence that Northwest's use of the Minneapolis hub varied in three time periods. Because this case was decided on summary judgment, I will recount the evidence in the light most favorable to the plaintiffs.

Before the merger, Northwest did not control a majority of the gates at Minneapolis or the flights arriving and departing from there. Before the merger, Northwest was not able to charge a premium above the competitive price for Minneapolis flights, because it had to compete with Republic.[17]

---

[16]Ohanian Report, App. 152-55; Strong Report, App. 237 ("The hub dominance and corresponding market power was firmly established by 1994 . . . .").

[17]See footnote 1, supra.

-24-

Upon acquiring Republic, Northwest gained a dominant position at the Minneapolis airport.[18] In the period between the merger and 1994, Northwest did charge a premium (above the weighted national average price) for Minneapolis flights, but it was a relatively small premium.[19] A plaintiff's expert explained that factors such as the 1991-1992 recession and Northwest's own financial difficulties prevented Northwest from making effective use of its control of the Minneapolis hub to extract a large monopoly premium there.[20]

Beginning in June 1993, Northwest responded to new developments, in part by using the Minneapolis hub it gained in the merger. Several conditions combined to allow this new use of the Minneapolis hub.

First, it took some time after airline deregulation for experience to accrue demonstrating the competitive advantages for an airline of dominating a hub airport. The Northwest-Republic merger was part of a wave of airline mergers in the 1980's. The Northwest-Republic merger was allowed by the Department of Transportation, over Department of Justice protest, because the DOT believed in the theory of "contestability"–that new carriers could easily enter new markets and therefore the specter of competition would discipline dominant carriers.[21] As history unfolded, the

---

[18]Northwest Airlines, as a result of its acquisition of Republic Airlines in 1986, was able to establish and sustain a service network that includes dominant hub airports at Minneapolis-St. Paul (MSP), Detroit Metro Wayne County (DTW), and Memphis (MEM)." Strong Report, App. 200.

[19]Ohanian Report, App. 166-67 (citing two reports: one comparing 21% premium in 1993 to 40.3% premium in 1994-97; and the other comparing premium of 23% in 1988 to figures of 41% and 44% in 1995 and 1997, respectively).

[20]hanian Report, App. 170.

[21]Dempsey, supra, at 139-40 ("The DOT's highly permissive policies with respect to mergers led to an explosion of such activity. . . . Many of these mergers

theory was disproved.[22]  Michael E. Levine, of the Yale School of Management, wrote an influential article in 1987 concluding that hubs were important sources of competitive advantage for airlines and describing means by which airlines with strong hubs exploited that advantage.  See Michael E. Levine, "Airline Competition in Deregulated Markets: Theory, Firm Strategy, and Public Policy," 4 Yale Journal of Regulation 393 (1987).  Northwest hired Levine in 1992 as Executive Vice President for Marketing.  Levine determined that Northwest should abandon its previous strategy of competing with the three biggest airlines on their own turf and concentrate on reaping the advantages of Northwest's existing strong hubs.  Davis Dyer and Len Schlesinger, "Northwest Airlines: Coping with Change," Harvard Business School, No. 9-897-027 at 10 (1997).

Second, the industry developed new yield management systems that allowed airlines to monitor ticket sales and instantly respond to exploit particular market opportunities.  In 1994, Northwest put in place newly developed yield management computer systems which allowed Northwest to manipulate pricing on threatened

---

were approved under the then-prevailing (and since discredited) neo-classical economics view that 'contestability' of markets would arrest any anticompetitive conduct.  The Northwest-Republic and TWA-Ozark mergers were vigorously opposed by the U.S. Department of Justice [DOJ] on grounds that they would create hub monopolies at Minneapolis and St. Louis, respectively.").

[22]Proponents of deregulation believed that airline markets were "contestable," that is, new carriers could easily enter markets because airlines' key resources–airplanes–are highly mobile.  As it turns out, however, other equipment and facilities needed to serve a route–especially gate space–can be difficult and costly to obtain. Facilities may also be limited for ticketing, baggage handling, operations and maintenance.

Minnesota Planning, supra, at 13.

routes by offering more seats at already-established low fares, thus responding to new entrants without sparking a general price war.[23]

Third, a new type of airline entered the picture. "In the wake of the economic recovery from the Gulf War recession, the U.S. airline industry in 1993-94 experienced a significant upsurge in applications and entry by low-fare new entrant airlines, typically operating with lower costs and offering service at significantly lower fares than the major network airlines."[24] Where such airlines were able to establish routes at a hub, hub premiums collected by the dominant carrier declined.[25]

In response to this new threat, Northwest used its control of the Minneapolis hub to chase out low-fare entrants by price cuts focused on the entrant's routes and by swamping the challenged routes with flights and seats.[26] Northwest's size

---

[23]Strong Report, App. 208-10, 218. Cf. Levine, supra, at 477 ("The complex fare structures with computerized capacity controls which have come to dominate the industry play an important role in these competitive tactics.").

[24]Strong Report, App. 201; Dep't of Transportation, Office of Aviation and International Affairs, The Low Cost Airline Service Revolution 3 (April 1996) ("[S]ince early1993, the pace of this major evolutionary development [the "advent of low-cost carriers"] has dramatically quickened.").

[25]Strong Report, App. 216-17.

[26]A specific pattern of anticompetitive behavior began to be apparent in 1993-94 and continued thereafter. These practices include capacity "dumping" of low fare seats and flight frequencies, "bracketing" of flights, restrictive controls over gates at its fortress hub airports, targeted frequent flyer and travel agent incentive programs. These practices serve to make sustained competition much more difficult for low-fare carriers, especially new entrants who do not have the size or network operations of Northwest or the financial resources to withstand prolonged periods of such anticompetitive behavior.

advantage over the entrants, which obviously resulted in part from the merger, gave Northwest the financial staying power to engage in targeted price cuts so that the new entrants could not sustain a pricing advantage or even price parity.[27] Using the sophisticated yield management systems now available, Northwest could focus price responses on the particular routes challenged without sparking an industry-wide price war.[28] In at least one case, Northwest cut fares on the challenged routes below variable cost until the new entrant gave up the route.[29] Facilities and equipment gained during the merger[30] gave Northwest the capacity to swamp the market with

---

Strong Report, App. 203 (footnote omitted). Strong's list of Northwest's techniques to drive new entrants out of the market included some actions that were directly dependent on controlling facilities at Minneapolis ("Restrictions on gates or facilities (e.g., counters, operations offices) that prevent a new entrant from being able to launch competing service") and others that capitalize on Northwest's ability to offer more flights ("Scheduling departures in close proximity to the new entrant's flights, known as 'bracketing.'"). This technique was described in an article by Michael Levine: "Add frequency where possible, to 'sandwich' the new entrant's departures between one's own departures." Levine, supra, at 476.

[27]Strong Report, App. 218-20 ("As a major airline, Northwest's ability to sustain such revenue losses is likely to be much greater than a smaller entering carrier."). Cf. Levine, supra, at 477 ("The object is to reduce trial and to subject the new entrant to a prolonged period of operation at low load factors. This strategy saps the entrant's working capital . . . .").

[28]Strong Report, App. 218.

[29]E.g., Strong Report, App. 223-24 (during time Vanguard Airlines competed on Minneapolis-Des Moines route, Northwest charged prices below variable cost).

[30]Although Midwest has not pointed to much specific evidence of what particular Republic assets were used, the record does contain evidence that would allow a finder of fact to conclude that, for instance, Northwest implemented its new strategies using Republic's DC-9's and gates gained in the merger. Beyer Report, App. 22 (Northwest controlled approximately 75% of gates at Minneapolis after merger); Richard Ihrig Affidavit, App. 7-9 (summarizing evidence that DC-9 aircraft

flights and seats,[31] so that the new entrants could not offer any scheduling advantage to travelers.  Once the new entrant had been chased out of town, Northwest cut back its flights and raised its fares above the level where they had been before the new entrant's challenge.[32]

The plaintiffs came forward with evidence that only within the limitations period did Northwest gain the knowledge, the technology, and the market conditions that allowed it to exploit the market power the Republic merger placed in its grasp. I cannot concur in affirming summary judgment on such a record.

_____

gained in merger were used to add flights on challenged routes).

[31]Strong Report, App. 221-22 (generally), 225 (when Vanguard entered Kansas City-Minneapolis market, Northwest increased number of flights on the route by 48% and number of seats by 53%); 230-31 (when Sun Country Airlines entered Minneapolis market, Northwest added 33% to seat capacity of challenged routes in two years, whereas rate of growth for previous five years was 1%; increase was almost five times the number of seats offered by Sun Country on route); cf. Levine, supra, at 477 ("If circumstances (including the financial condition of the new entrant) warrant, the incumbent can flood the market with low-priced seats, withdrawing them almost invisibly at peak times or as competitive conditions allow.").

[32]Strong Report, App. 223-24 (Vanguard airlines); 232 (after Kiwi International was forced from Minneapolis-Detroit market, Northwest changed fare from $69 to $467).