# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-2789

_____

In re: In Re: Pre -Filled Propane Tank Antitrust Litigation

------------------------------

Hartig Drug Company; Jason Moore's Texaco, L.L.C., doing business as Moore's Texaco; Mario Ortiz; Stephen Morrison; Steven Tseffos; Glenville Shell, LLC; Zarco USA, Inc.; AQ Investments, LLC; LJax Enterprises, Inc.; J & V Management, LLC; Butch's Central Coastal, Inc.; Zerka's Party Store, Inc.; OM Commercial Neenah Oil, Inc.; CCLAS, Inc.; Hopewell Exxon, LLC; Tuban Petroleum, LLC; 33 and a Third, LLC; Tuban 610, LLC; Highway 182, LLC; West Main Street, LLC; Roth's Country Corner, Inc.; 1919 Airline Hwy., LLC; East Airline, LLC; Gramercy Cheap Smokes, LLC; Conti's Service Center, Inc.; Route 49 Gas & Go, Inc.; Surinder Kaur, Inc.

*Plaintiff*s

Morgan-Larson, LLC

*Plaintiff - Appellant*

Ashville General Store, Inc.; Sean Venezia; Michael S. Harvey; Gregory Ludvigsen; Arthur Hull; Alan Rockwell; James Halgerson; Thomas R. Clark; Bryce Mander; Alex Chernavsky; Arrow Hardware, LLC; Birdie's, Inc.; Alex Chernavsky; Lochraven Sunoco, Inc.; American Auto Repair

*Plaintiff*s

Johnson Auto Electric, Inc.

*Plaintiff - Appellant*

Cedar Holly Investments, LLC; Tuckerton Lumber Company; Ace High Auto Repair & Propane; CEFO Enterprise Corp.; Jon Wall, Inc.; RC Gasoline

*Plaintiff*s

Speed Stop 32, Inc.

*Plaintiff - Appellant*

Zarco USA, Inc.; Dunmore Oil Co., Inc.; JoJo Oil Co., Inc.; Ekonomy Enterprises, Inc.

*Plaintiff*s

Yocum Oil Company, Inc.

*Plaintiff - Appellant*

v.

Ferrellgas Partners, L.P. a limited partnership; Ferrellgas, L.P. a limited partnership, doing business as Blue Rhino; AmeriGas Partners, LP a limited partnership; UGI Corporation; AmeriGas Propane, Inc., doing business as AmeriGas Cylinder Exchange; AmeriGas Propane, LP

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 4, 2017
Filed: June 23, 2017

_____

Before SMITH, Chief Judge, WOLLMAN, LOKEN, RILEY, COLLOTON, GRUENDER, BENTON, SHEPHERD, and KELLY, Circuit Judges, En Banc.

_____

BENTON, Circuit Judge.

Plaintiffs Morgan-Larson, LLC, Johnson Auto Electric, Inc., Speed Stop 32, Inc., and Yocum Oil Company, Inc. sued Defendants Ferrellgas Partners, L.P., Ferrellgas, L.P. (collectively "Ferrellgas"), AmeriGas Partners, L.P., AmeriGas Propane, Inc., and AmeriGas Propane, L.P. (collectively "AmeriGas") under Section 1 of the Sherman Act, 15 U.S.C. § 1. The district court dismissed the claims as barred by the statute of limitations. Having jurisdiction under 28 U.S.C. § 1291, this court reverses.

## I.

Ferrellgas[1] and AmeriGas are the largest distributors of pre-filled propane exchange tanks, which come in a standard size. Before 2008, Defendants filled the tanks with 17 pounds of propane. In 2008, due to rising propane prices, Defendants reduced the amount of propane in each tank from 17 to 15 pounds, but maintained the same price. According to the amended complaint, "this amounted to an effective price increase of 13%."

In 2009, a group of plaintiffs—indirect purchasers who bought tanks from retailers—filed a class action alleging Defendants conspired to reduce the amount of propane in the tanks while maintaining the price, in violation of Section 1 of the Sherman Act and state antitrust and consumer protection laws. In 2010, the parties settled. *See **In re Pre-Filled Propane Tank Mktg. & Sales Practices Litig**.*, No. 09-2086-MD-W-GAF, 2010 WL 2008837 (W.D. Mo. May 19, 2010) (approving first amended settlement agreement).

---

[1]Ferrellgas does business as "Blue Rhino."

In 2014, the Federal Trade Commission issued a complaint against Defendants—later settled—for conspiring to artificially inflate tank prices. *See **In re Ferrellgas Partners, L.P., et al.***, Docket No. 9360, 2014 WL 1396496 (Mar. 27, 2014). Later that year, Plaintiffs in this case—direct purchasers who bought tanks directly from Defendants for resale—sued. They allege Defendants colluded to decrease the fill level of tanks and continued to charge "supracompetitive prices . . . throughout the Class Period."

The district court dismissed Plaintiffs' claims as barred by the statute of limitations. On appeal, a divided panel of this court affirmed. ***In re Pre-Filled Propane Tank Antitrust Litig***., 834 F.3d 943 (8th Cir. 2016), *as corrected* (Aug. 25, 2016), *reh'g en banc granted, opinion vacated* (Dec. 29, 2016). This court granted rehearing en banc, vacated the panel decision, and now reverses.

II.

This court reviews de novo the grant of a motion to dismiss. ***Christiansen v. West Branch Cmty. Sch. Dist.***, 674 F.3d 927, 933-34 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, the complaint must show the plaintiff "is entitled to relief," **Fed. R. Civ. P. 8(a)(2)**, by alleging "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" ***Ashcroft v. Iqbal***, 556 U.S. 662, 678 (2009), *quoting **Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 570 (2007). A plausible claim must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." ***Id.***, *quoting **Twombly***, 550 U.S. at 556. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." ***Id.***, *citing **Twombly***, 550 U.S. at 556. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" ***Id.***, *quoting **Twombly***, 550 U.S. at 555, 557 (citation omitted).

-4-

Rather, the facts alleged "must be enough to raise a right to relief above the speculative level." ***Twombly***, 550 U.S. at 555.

Also reviewed de novo is whether a claim is barred by the statute of limitations. ***McDonough v. Anoka Cnty.***, 799 F.3d 931, 939-40 (8th Cir. 2015). "A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) as barred by a statute of limitations if the complaint itself shows that the claim is time-barred." ***Wong v. Wells Fargo Bank N.A.***, 789 F.3d 889, 897 (8th Cir. 2015), *citing* ***Illig v. Union Elec. Co.***, 652 F.3d 971, 976 (8th Cir. 2011). Actions under Section 1 of the Sherman Act must be filed "within four years after the cause of action accrued." **15 U.S.C. § 15b**. "Generally, the period commences on the date the cause of action accrues, that being, the date on which the wrongdoer commits an act that injures the business of another." ***Varner v. Peterson Farms***, 371 F.3d 1011, 1019 (8th Cir. 2004), *citing* ***Zenith Radio Corp. v. Hazeltine Research, Inc.***, 401 U.S. 321, 338 (1971).

Plaintiffs allege a continuing violation—an exception to the general rule—which restarts the statute of limitations period each time the defendant commits an overt act. *See id.* "An overt act has two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act, and (2) it must inflict new and accumulating injury on the plaintiff." ***Id.***, *citing* ***Pace Indus., Inc. v. Three Phoenix Co.***, 813 F.2d 234, 238 (9th Cir. 1987).

III.

Plaintiffs allege two types of overt acts within the limitations period: (1) Defendants' sales to Plaintiffs at artificially inflated prices; and (2) conspiratorial communications between Defendants about pricing and fill levels. The first type of act is at issue here—whether sales at artificially inflated prices are overt acts that

restart the statute of limitations.[2]  Also at issue is whether Plaintiffs allege a continuing violation exception sufficient to restart the statute of limitations.

### A.

The Supreme Court of the United States addressed the first issue in *Klehr v. A.O. Smith Corporation*, 521 U.S. 179 (1997).  The Supreme Court defined a continuing violation under antitrust law:

> Antitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.,* each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Klehr*, 521 U.S. at 189, *quoting* **2  P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b**, p. 145 (rev. ed. 1995) (hereinafter **2 Areeda & Hovenkamp**).

Defendants argue *Klehr* does not apply because it is a RICO case, and the quoted language is dicta.  This court and others have held that "federal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . [the dicta] is of recent vintage and not enfeebled by any [later] statement.'"  **Jones v. St. Paul Co., Inc.**, 495 F.3d 888, 893 (8th Cir. 2015), *quoting* **City of Timber Lake v. Cheyenne River Sioux Tribe**, 10 F.3d 554, 557 (8th Cir. 1993), *quoting* **McCoy v. Massachusetts Inst. of Tech.**, 950 F.2d 13, 19 (1st Cir. 1991).  *See* **American Civil Liberties Union of Ky. v. McCreary**

---

[2]Because continued sales at supracompetitive prices are overt acts under the continuing violations theory, this court need not address Plaintiffs' allegations that Defendants' conspiratorial communications about pricing and fill levels were additional overt acts sufficient to invoke the theory.

*Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) ("Lower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.") (internal quotation marks omitted); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("While these statements are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.").

Although panels have held that federal courts are "bound" by Supreme Court dicta, this goes too far. Appellate courts should afford deference and respect to Supreme Court dicta, particularly where, as here, it is consistent with longstanding Supreme Court precedent. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 561 (3d Cir. 2003) (en banc) ("Although the Committee is doubtless correct that the Supreme Court's dicta are not binding on us, we do not view it lightly. . . . [W]e should not idly ignore considered statements the Supreme Court makes in dicta."); *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("We do not treat considered dicta from the Supreme Court lightly. Rather, we accord it appropriate deference. . . . As we have frequently acknowledged, Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding.") (citations and internal quotation marks omitted); *Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 120 n.8 (7th Cir. 1989) ("This Court should respect considered Supreme Court dicta."); Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, **81 N.Y.U.L. Rev. 1249**, 1269-75 (2006).

*Klehr's* definition of a continuing violation follows longstanding Supreme Court precedent. The Supreme Court first applied the doctrine in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968). Hanover alleged that United, its shoe machinery manufacturer and distributor, monopolized the industry in

violation of Section 2 of the Sherman Act. ***Hanover Shoe***, 392 U.S. at 483-84. United moved to dismiss the claims as time-barred because "the earliest impact on Hanover of United's lease only policy occurred in 1912." ***Id.*** at 502 n.15. Rejecting that argument, the Supreme Court said:

> We are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on Hanover. Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

***Id.***

The Supreme Court again applied the doctrine in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), a case alleging antitrust violations by unlawful participation in patent pools. The issue was "whether Zenith can recover in its 1963 suit for damages suffered after June 1, 1959, as the consequence of pre-1954 conspiratorial conduct." ***Zenith***, 401 U.S. at 338. Describing when an antitrust claim accrues under 15 U.S.C. § 15b, the Court said:

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

***Id.*** *Klehr* thus is consistent with the Supreme Court's continuing violation doctrine as established in *Hanover Shoe* and *Zenith*.

*Klehr* also is consistent with Areeda and Hovenkamp's <u>Antitrust Law</u>, the leading treatise on the subject. The version of the treatise quoted in *Klehr* explains that, "In the case of a continuing violation, each overt act that is part of the violation and that injures the plaintiff starts the statutory period running again." **2 Areeda & Hovenkamp**, at 145. Citing *Hanover Shoe*, it also directly addresses additional sales at fixed prices: "so long as an illegal price-fixing conspiracy was alive, each sale at the fixed price [started the four-year statute of limitation anew]." ***Id.***, *citing **Hanover Shoe***, 392 U.S. at 502 n.15.

Every other circuit to consider this issue applies *Klehr*, holding that each sale in a price-fixing conspiracy is an overt act that restarts the statute of limitations. *See **Oliver v. SD-3C LLC***, 751 F.3d 1081, 1086 (9th Cir. 2014) ("Turning first to the continuing violation exception, the Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act."); ***In re Travel Agent Comm'n Antitrust Litig.***, 583 F.3d 896, 902 (6th Cir. 2009) ("*Klehr* simply reiterates that the antitrust laws recognize continuing violations and, more precisely, that a new § 1 claim arises each time a company sells a price-fixed product."); ***In re Cotton Yarn Antitrust Litig.***, 505 F.3d 274, 290-91 (4th Cir. 2007) ("In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act. Thus, in cases like this one involving allegations of a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.,* each sale to the plaintiff, starts the statutory period running again.") (citation and internal quotation marks omitted); ***Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.***, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000) ("An act constitutes a continuing violation, if it injures the plaintiff over a period of time. Even though the

-9-

illegal act occurs at a specific point in time, if it inflicts continuing and accumulating harm on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act. For example, when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues. As a cause of action accrues with each sale, the statute of limitations begins to run anew.") (citations and internal quotation marks omitted).

This court recently established that *Klehr* controls. In *In re Wholesale Grocery Products Antitrust Litigation*, 752 F.3d 728 (8th Cir. 2014), two rival wholesalers allegedly used an asset-exchange agreement to allocate customers and territories in violation of Section 1 of the Sherman Act. **Wholesale Grocery**, 752 F.3d at 729. The plaintiffs sued more than four years after the agreement. *Id.* at 731. The defendants argued the claims were untimely and the continuing violation theory inapplicable because sales at supracompetitive prices were not overt acts. *Id.* This court held:

> The timeliness question in this case is controlled by *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S. Ct. 1984, 138 L.Ed.2d 373 (1997). In *Klehr*, the Supreme Court explained that "in the case of a continuing violation," "each overt act that is part of the violation and that injures the plaintiff, *e.g., each sale to the plaintiff,* starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Id.* at 736, *quoting* **Klehr**, 521 U.S. at 189. *See* **Concord Boat Corp. v. Brunswick Corp.**, 207 F.3d 1039, 1052 (8th Cir. 2000) (recognizing that "each new sale by a Sherman Act price fixing defendant" is a "separate new overt act").

Defendants argue *Wholesale Grocery* does not apply because "the anticompetitive nature of the wholesalers' agreement was not revealed until several years after the asset exchange." **Wholesale Grocery**, 752 F.3d at 736. But,

-10-

knowledge of anticompetitive conduct is not relevant to the continuing violation analysis. As the Supreme Court says, "each sale to the plaintiff, starts the statutory period running again, *regardless of the plaintiffs' knowledge of the alleged illegality at much earlier times*." **Klehr**, 521 U.S. at 189 (emphasis added) (internal quotation marks omitted).

Defendants rely on *Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004) to argue that continued anticompetitive conduct, without more, does not restart the limitations period. There, the defendants induced the plaintiffs to take out a loan based on false information. **Varner**, 371 F.3d at 1014-15. More than four years later, the plaintiffs sued for antitrust "tying" violations under a continuing violation theory. **Id.** at 1015. This court rejected the theory, holding that "[p]erformance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period," because "[a]cts that are merely unabated inertial consequences of a single act do not restart the statute of limitations." **Id.** at 1019-20 (internal quotation marks omitted).

This case is distinguishable. *Varner* is about a tying arrangement, not "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years." **Klehr**, 521 U.S. at 189. Unlike the vertical restraint in *Varner*, the horizontal restraint here is a *per se* antitrust violation. *Compare* **Leegin Creative Leather Prods., Inc. v. PSKS, Inc.**, 551 U.S. 877, 886, 888 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices. . . . . Our recent cases formulate antitrust principles in accordance with the appreciated differences in economic effect between vertical and horizontal agreements."), *with* **Business Elecs. Corp. v. Sharp Elecs. Corp.**, 485 U.S. 717, 735-36 (1988) ("[A] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels."). *See* **P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 320c(1)** (4th ed. 2016) (noting that application of the continuing violation doctrine in the antitrust

-11-

context depends on the nature of the violation and whether it involves a "cartel, vertical agreement or refusal to deal, monopolization, or merger") (citations omitted). As a *per se* violation, the horizontal restraint has "manifestly anticompetitive effects, and lack[s] . . . any redeeming virtue." **Leegin**, 551 U.S. at 886 (citation and internal quotation marks omitted). Defendants' horizontal price-fixing agreement gave them "unlawfully acquired market power to charge an elevated price." **Wholesale Grocery**, 752 F.3d at 736. Each time Defendants used that power (*i.e.*, each sale), they committed an overt act, inflicting new and accumulating injury. *See **id.** See also* **Klehr**, 521 U.S. at 189.

This case also is distinguishable from *Midwestern Machinery Co., Inc. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), another case on which Defendants rely. *Midwestern Machinery* involved a merger claim brought under Section 7 of the Clayton Act. There, this court distinguished between merger and conspiracy cases:

> Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme. A continuing violation theory based on overt acts that further the objectives of an antitrust conspiracy in violation of § 1 of the Sherman Act or that are designed to promote a monopoly in violation of § 2 of that act cannot apply to mergers under § 7 of the Clayton Act.

*Midwestern Mach.*, 392 F.3d at 271. *Midwestern Machinery* did not announce a rule for price-fixing conspiracies. To the contrary, the opinion expressly disavows any modification to the *Klehr* continuing violation doctrine as applied in price-fixing conspiracies. **Id.** at 269 ("Midwestern, however, cites no appellate decisions applying [the continuing violation] principle to § 7 claims. Rather, it attempts to analogize this case to other areas of antitrust law where such a theory has in fact been recognized.").

Finally, Defendants contend the *Klehr* rule encourages plaintiffs to sleep on their rights. The Supreme Court rejects this contention as irrelevant: "[E]ach sale to

the plaintiff starts the statutory period running again regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *See* **Klehr**, 521 U.S. at 189 (internal quotation marks omitted). *See also* **Hanover Shoe**, 392 U.S. at 502 n.15 (noting, in the case of a continuing violation under the Sherman Act, "Although [plaintiff] could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955"). At any rate, the *Klehr* rule does not discourage timely filed suits because a "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." **Klehr**, 521 U.S. at 190. Instead, the rule prevents companies from "agree[ing] to divide markets for the purpose of raising prices, wait[ing] four years to raise prices, then reap[ing] the profits of their illegal agreement with impunity because any antitrust claims would be time barred." **Wholesale Grocery**, 752 F.3d at 736.

*Klehr's* definition of a continuing violation under antitrust law is consistent with Supreme Court precedent and the leading antitrust treatise and has been applied by this court to a price-fixing conspiracy. It controls here. *See **id.*** ("The timeliness question in this case is controlled by *Klehr*."). Under *Klehr*, "each sale to the plaintiff[s]" in a price-fixing conspiracy "starts the statutory period running again." **Klehr**, 521 U.S. at 189.

## B.

The other issue is whether the amended complaint adequately pleads a continuing violation sufficient to restart the statute of limitations. Under *Klehr*, Plaintiffs must allege: (1) "a price-fixing conspiracy;" (2) "that brings about a series of unlawfully high priced sales" during the class period; and (3) "sale[s] to the plaintiff[s]" during the class period. ***Id.*** In paragraph 111 of the amended complaint, Plaintiffs allege all three necessary elements:

-13-

Plaintiffs purchased Filled Propane Exchange Tanks from Blue Rhino or AmeriGas on multiple occasions during the Class Period. On each occasion, Plaintiffs purchased Filled Propane Exchange Tanks containing only 15 pounds of propane, pursuant to the conspiracy, but sold at the price they would have been charged for 17-pound tanks but for the conspiracy. As Defendants kept prices constant despite the fill level reduction, this amounted to an effective price increase of 13%.

*Amended Complaint*, at ¶111. Standing alone, this "formulaic recitation of the elements of a cause of action" may be insufficient. *Twombly*, 550 U.S. at 555. While the complaint "does not need detailed factual allegations," it does require "more than labels and conclusions." *Id.* Rather, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

Defendants argue that the amended complaint fails to allege a price-fixing conspiracy because it does not "plausibly suggest that either Defendant's decision to reduce fill levels was the result of an agreement." The district court did not rule on this issue. Rather, it assumed the existence of an agreement: "Unlike in *Wholesale Grocery Products*, the anticompetitive nature of Defendants' agreement was not revealed years later during the limitations period;" "Plaintiffs make no allegations that Defendants ever made any changes or modifications to their agreement during the limitations period;" and "[C]ommunications were mere reaffirmations of the prior agreement."

The allegations of a price-fixing conspiracy are sufficient. Plaintiffs plead that Defendants "conspired and acted in concert to eliminate competition by reducing the amount of propane they would put in their tanks, thereby raising the per-pound price of propane across the country as well as by dividing the market for Filled Propane Exchange Tanks in violation of federal antitrust law." *Amended Complaint*, at ¶1. Even more specifically, they plead that "Blue Rhino's President, Tod Brown, and AmeriGas's Director of National Accounts, Ken Janish, exchanged seven phone calls on June 18 and 19, 2008, during which AmeriGas agreed that if Blue Rhino reduced

-14-

its fill levels to 15 pounds per tank, AmeriGas would follow suit." *Id.* at ¶9. Defendants later "engaged in dozens of calls, emails, and in-person meetings to coordinate a unified front that would leave the largest retailers and then the entire industry with no choice but to accept their demands." *Id.* at ¶8. "[N]o later than spring 2008," Defendants "reduced their fill levels from 17 pounds per tank to 15 pounds per tank while maintaining the same price per 'full' tank, for the purpose of increasing their margins on the sale of propane exchange tanks." *Id.* at ¶7. "This collusion effectively raised the prices charged to Plaintiffs by more than 13% per pound." *Id.*

"[S]howing parallel conduct or interdependence, without more," "falls short of conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Twombly*, 550 U.S. at 553-54 (alterations in original) (internal quotation marks omitted). However, "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim." *Id.* at 557. With "further factual enhancement," plaintiffs can "nudge[] their claims across the line from conceivable to plausible." *Id.* at 557, 570. The allegations here state enough factual enhancements to show more than parallel conduct. Plaintiffs plead facts showing Defendants acted collusively, pursuant to a collective interest to reduce the amount of propane in each tank sold, while maintaining the price. *See Amended Complaint*, at ¶¶1, 7-11, 66, 134. These allegations sufficiently allege a price-fixing conspiracy.

Next, Plaintiffs must allege the conspiracy "brings about a series of unlawfully high priced sales" during the class period. In their motion to dismiss, Defendants argue Plaintiffs fail to allege a continuing conspiracy, "invok[ing] continuing violations in name only and offer[ing] no factual allegations indicating any continued conduct within the limitations period." They assert that Plaintiffs' "bare assertions that the conduct at issue continued 'until at least late 2010,' are conclusory and fail to meet the *Twombly* standard of plausibility."

-15-

The allegations that the conspiracy continued into the class period are sufficient. Plaintiffs plead that "Defendants' anticompetitive conduct lasted at least from July 21, 2008 through January 9, 2015" and "as a result of the[ir] anticompetitive conduct . . . Defendants have charged Plaintiffs and members of the proposed Class supracompetitive prices for Filled Propane Exchange Tanks throughout the Class Period." *Amended Complaint*, at ¶¶120-21. *See id.* at ¶¶122-23. Despite the settlement agreement with indirect purchasers in 2010, they plead that "Defendants maintained their illegally agreed-upon fill levels rather than resuming competition, preserving the unlawfully inflated prices that their conspiracy had produced." *Id.* at ¶108. *See id.* at ¶124. Plaintiffs also plead that "[t]hrough at least the end of 2010, Defendants regularly communicated to assure compliance with the conspiracy," "monitor[ing] the market to ensure that neither cheated on their anticompetitive agreement by offering a price reduction or competing for one another's customers or geographic markets." *Id.* at ¶92. *See id.* at ¶125. More specifically, they plead that in 2008, AmeriGas's Director of National Accounts Ken Janish told Blue Rhino's President Tod Brown that "it would follow closely behind Blue Rhino if it successfully implemented its fill reduction, and that it would not sell both 15-pound and 17-pound tanks" and "Janish had similar conversations with employees of Blue Rhino on numerous occasions from at least as early as 2007 until at least late 2010." *Id.* at ¶60. Additionally, "during calls and meetings with AmeriGas executives occurring at least as late as 2010, Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price or fill levels with words to the effect of, 'I talked to Blue Rhino, and that's not going to happen.'" *Id.* at ¶13. *See id.* at ¶62.

Some of these allegations are "naked assertion[s] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted), that do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. *See, e.g.*, *Amended Complaint*, at ¶¶120, 125. Others, however, list relevant individuals, acts, and conversations, providing "factual content" to support "the reasonable

-16-

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. *See, e.g.*, *Amended Complaint*, at ¶¶13, 60, 92. Defendants argue these allegations are "impermissibly vague and conclusory." But Plaintiffs "need not provide *specific facts* in support of their allegations." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (emphasis added), *citing Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). Rather, they need only provide "sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Id.*, *quoting Twombly*, 550 U.S. at 555, 555 n.3. "[C]onstru[ing] the complaint liberally in the light most favorable to" Plaintiffs, *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008), these allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

According to Defendants, Plaintiffs' allegation that "the propane conspiracy succeeded," *Amended Complaint*, at ¶ 10, made the maintenance of fill levels and prices mere "unabated inertial consequences" and not overt acts continuing the conspiracy. But the question here is not whether the amended complaint alleges other overt acts in addition to sales to the Plaintiffs; the issue is whether the amended complaint alleges that the conspiracy continued when the sales took place. If so, under *Klehr*, "each sale to the plaintiff," is an overt act that restarts the statute of limitations. *Klehr*, 521 U.S. at 189. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940) ("[T]he conspiracy contemplated and embraced, at least by clear implication, sales to jobbers and consumers in the Mid-Western area at the enhanced prices. The making of those sales supplied part of the 'continuous cooperation' necessary to keep the conspiracy alive.").

In any event, this court has never applied the "unabated inertial consequences" test to a horizontal price-fixing conspiracy, let alone one where Plaintiffs allege that "sales pursuant to the conspiracy continued throughout the Class Period," and "Defendants continued to have regular communications regarding pricing, fill levels, and market allocation until at least late 2010." *Amended Complaint*, at ¶¶ 123, 109.

*See, e.g.*, **Concord Boat**, 207 F.3d at 1052 ("Continuing violations typically arise in the context of Sherman Act . . . claims where multiple defendants are alleged to be part of an ongoing conspiracy."). In context, Defendants' conspiracy "succeeded" in "forc[ing] Walmart and other large retailers to accept the fill reduction" and raising the "wholesale prices at which [they] sold propane in Filled Propane Exchange Tanks to retailers throughout the United States." **Amended Complaint**, at ¶10. This success did not end the conspiracy, but rather was a precondition to the price-fixing scheme Plaintiffs allege continued into the class period.

Finally, the amended complaint must allege "sale[s] to the plaintiff[s]" during the class period. Defendants do not dispute the sufficiency of these allegations: Since 2008 and continuing through the class period, Plaintiffs "purchased Filled Propane Exchange Tanks from one or more of the Defendants and . . . paid inflated per-pound prices due to Defendants' unlawful conspiracy." **Amended Complaint**, at ¶¶18-21.

The amended complaint alleges "sufficient factual matter, accepted as true," to show a continuing violation to restart the statute of limitations, and, therefore, "to state a claim to relief that is plausible on its face." **Iqbal**, 556 U.S. at 678, *quoting* **Twombly**, 550 U.S. at 570. Because it is not "clear from the face of the complaint that the action is barred by the applicable limitations period," **Varner**, 371 F.3d at 1016, the district court erred in granting the motion to dismiss.

\* \* \* \* \* \* \*

The judgment is reversed.

SHEPHERD, Circuit Judge, with whom WOLLMAN and LOKEN, Circuit Judges, join, dissenting, and with whom KELLY, Circuit Judge, joins Parts I.B and II of the dissent.

-18-

Today's opinion incorrectly interprets Supreme Court precedent, fails to hold the plaintiffs' complaint to the plausibility standard of Twombly and Iqbal, and ignores the purposes of the antitrust statute of limitations. For these reasons, I respectfully dissent.

I.

First, the opinion interprets the antitrust discussion in Klehr completely divorced from the facts and issues confronting the Supreme Court in that case. As a result, the majority fails to apply antitrust law correctly to the case before us. Had the majority considered Klehr in context, it would have found that plaintiffs must show a live, ongoing conspiracy within the limitations period to survive a motion to dismiss.

A.

Klehr v. A.O. Smith Corp. was a RICO case that rejected the Third Circuit's "last predicate rule" for tolling claims brought under that statute. 521 U.S. 179, 187 (1997). Because "Congress consciously patterned civil RICO after the Clayton Act," the Supreme Court employed a "Clayton Act *analogy*" to explain why the Third Circuit had erred. Id. at 189 (emphasis added). In its attempt to explain the tolling requirements of RICO, the Court offered the following restatement of antitrust law:

> Antitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g., each sale to the plaintiff*, "starts the statutory period running again . . . ."

-19-

Id. (emphasis added) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b, at 145 (rev. ed. 1995)).

Klehr was a RICO case, not an antitrust case. The parties in Klehr litigated RICO issues, not antitrust issues. The Supreme Court's short discussion of antitrust law served only to illuminate the discussion of tolling RICO claims.[3] The Court was neither announcing some new standard in antitrust law nor redefining a continuing violation. It simply used established principles of antitrust law to "help . . . make[] clear" the RICO issue. Id.

With the excerpted language from Klehr in its proper context, we can better understand the antitrust principles it espouses. For its analogy, the Supreme Court turned to the leading treatise on the subject—Areeda and Hovenkamp's Antitrust Law. The original quote from Areeda reads, "In the case of a continuing violation, each overt act that is part of the violation and that injures the plaintiff starts the statutory period running again." 2 Areeda & Hovenkamp, supra, at 145. Areeda says nothing about "each sale to the plaintiff" constituting an overt act at this point. But Areeda does reach the issue just a few sentences later where it explains that, "*so long as an illegal price-fixing conspiracy was alive*, each sale at the fixed price [started the four-year statute of limitation anew]." Id. (emphasis added) (citing Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968)). Therefore each sale to the plaintiff can start the statutory period running again *so long as* an illegal price-fixing conspiracy is alive and ongoing.

---

[3] Judge Posner has described dicta as "any statement made by a court for use in argument, illustration, analogy or suggestion. It is a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication." United States v. Crawley, 837 F.2d 291, 292 (7th Cir. 1988) (internal quotation marks omitted). Because I believe the discussion of antitrust in Klehr falls under the category of dicta, I do not believe it deserves the lofty position of authority afforded to it by the majority's opinion. But I will proceed in my analysis as if the language is binding authority on us.

B.

Klehr is fully consonant with this interpretation. The antitrust analogy presumes that "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years" continues to exist. Klehr, 521 U.S. at 189. Further, the excerpted language states that "each sale to the plaintiff" must be "part of the violation." Id. (internal quotation marks omitted). So the plaintiffs must show that the sales occurred as a result of a live, ongoing conspiracy. See Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 269 (8th Cir. 2004) ("The typical antitrust continuing violation occurs in a price-fixing conspiracy . . . when conspirators continue to meet to fine-tune their cartel agreement."). This interpretation in no way "limit[s] Supreme Court opinions precisely to the facts of each case." See Jones v. St. Paul Cos., 495 F.3d 888, 893 (8th Cir. 2007) (internal quotation marks omitted). Instead, it gives meaning to an isolated excerpt by considering the broader factual context from which the excerpt came.

The other two Supreme Court cases cited in the majority opinion—Hanover Shoe and Zenith Radio—also support the proposition that plaintiffs must make a plausible showing of a live, ongoing conspiracy. In Hanover Shoe, Hanover alleged "that United's practice of leasing and refusing to sell its more complicated and important shoe machinery" violated antitrust law. 392 U.S. at 483. In its defense, United argued that "because the earliest impact on Hanover of United's lease only policy occurred in 1912, Hanover's cause of action arose during that year and is now barred by the . . . statute of limitations." Id. at 502 n.15. The Court rejected this argument because United's conduct was a continuing violation. Id. Importantly, the underlying conspiratorial activity (United's lease-only policy) was ongoing from 1912 through 1955. Id. This continued conspiratorial activity is what rendered each lease—and refusal to sell—an overt act that restarted the limitations period. See 2 Areeda & Hovenkamp, supra, at 145. Just as with Hanover Shoe, so too with Zenith Radio. Zenith sued Hazeltine Research over Hazeltine's "participation in patent

-21-

pools" that violated the Sherman Act. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 323 (1971). Zenith sought to recover damages suffered during the limitations period, even though Hazeltine entered the patent pools long before the limitations period. Id. at 338. The Court held that Zenith could recover damages, noting that Hazeltine was engaging in a "*continuing conspiracy* to violate the antitrust laws," and so each act harmful to Zenith restarted the limitations period. Id. (emphasis added). In Klehr, Hanover Shoe, and Zenith Radio, the Supreme Court understood that a necessary requirement for a continuing violation of antitrust laws is the existence of a live, ongoing conspiracy. Without such a requirement, plaintiffs could sue many years after an antitrust violation occurred and seek damages for subsequent sales without tying the prior antitrust violation to the subsequent sales.

II.

Accordingly, the plaintiffs must sufficiently allege that the defendants engaged in a live, ongoing conspiracy sometime in the limitations period to survive a motion to dismiss. The plaintiffs can accomplish this task by alleging "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard demands "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The plaintiffs have failed to make a plausible claim if all they offer are "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." Twombly, 550 U.S. at 555-57.

In determining whether the plaintiffs have pled a plausible cause of action, the majority relies heavily on paragraph 111 of the amended complaint:

Plaintiffs purchased Filled Propane Exchange Tanks from Blue Rhino or AmeriGas on multiple occasions during the Class Period. On each

-22-

occasion, Plaintiffs purchased Filled Propane Exchange Tanks containing only 15 pounds of propane, pursuant to the conspiracy, but sold at the price they would have been charged for 17-pound tanks but for the conspiracy. As Defendants kept prices constant despite the fill level reduction, this amounted to an effective price increase of 13%.

Amended Complaint ¶ 111, ECF No. 102. The majority takes these assertions, together with paragraphs 7 through 9, which allege facts occurring in 2008, and holds that the plaintiffs have "sufficiently allege[d] a price-fixing conspiracy."

The majority's holding flies in the face of Twombly and Iqbal. Paragraph 111 is, at best, a "formulaic recitation of the elements of a cause of action" insufficient under the plausibility standard. See Twombly, 550 U.S. at 555. And paragraphs 7 through 9 deal only with facts from 2008, well outside the limitations period. The majority opinion fails to discuss one factual allegation from within the limitations period in concluding that the plaintiffs have sufficiently alleged a conspiracy. This is perhaps not surprising, since virtually all of the amended complaint comprises either factual allegations from before the limitations period or naked assertions and conclusions.[4]

---

[4]There is but one possible exception: paragraph 13, which alleges that "during calls and meetings with AmeriGas executives occurring at least as late as 2010, Janish repeatedly dismissed concerns that Blue Rhino might undercut AmeriGas on price or fill levels with words to the effect of, 'I talked to Blue Rhino, and that's not going to happen.'" But even this allegation falls short of the Twombly standard. The complaint does not allege whether the conversations between AmeriGas and Blue Rhino occurred during the limitations period, only that comments from those alleged conversations were purportedly shared in a later retelling of the conversations. And the retelling can only report on "words *to the effect of*" whatever was said. The dates of the conversations are left to the widest range of time, though curiously late enough to just reach into the limitations period. To be sure, the complaint names one individual employed by AmeriGas. But naked assertions of misconduct, combined with a name discovered from a company directory, are not enough to survive a motion to dismiss under Twombly and Iqbal.

At oral argument, plaintiffs' counsel essentially conceded that the plaintiffs lack any factual allegations of a live, ongoing conspiracy during the limitations period. In response to a question asking whether there have been any overt acts to maintain the conspiracy during the limitations period, counsel could only identify paragraph 92 of the complaint. But paragraph 92 simply makes naked assertions —devoid of factual enhancements—that the defendants "regularly communicated" and "monitored the market" to ensure compliance. Pressed further about whether plaintiffs had alleged an ongoing price-fixing conspiracy, plaintiffs' counsel directed the court to paragraph 111—a mere recitation of the elements of the cause of action.

After a thorough review of the amended complaint, I find no plausible allegation of a live, ongoing conspiracy occurring within the limitations period. Indeed, the only factual allegations within the limitations period concern the fill levels of the propane tanks. Taking the factual allegations as true, the defendants conspired in 2008 to reduce the fill levels from 17 to 15 pounds.[5] The fill levels for propane tanks sold by all defendants remain at 15 pounds today. But allegations that fill levels remain at the same levels cannot suffice. Showing parallel conduct, without more, "falls short of conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." Id. at 553 (alterations in original) (internal quotation marks omitted). "Even conscious parallelism, a common reaction of firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions[,] is not in itself unlawful." Id. at 553-54 (first and second alterations in original) (internal quotation marks omitted). In the end, there is a simple question before us: Have the plaintiffs

---

[5]In fact, the FTC, whose 2014 lawsuit precipitated this case, disagrees with the plaintiffs' allegations. "The Commission's Complaint *does not allege* that [the defendants'] initial decisions to reduce fill levels to 15 pounds were the result of an agreement." In re Ferrellgas Partners, L.P., FTC Docket No. 9360, 2014 WL 5787605, at *6 (Oct. 31, 2014) (emphasis added).

plausibly pled a live, ongoing conspiracy among these competitors?  The answer to this question is likewise simple:  No.

III.

Today's opinion runs counter to the purposes that underlie the imposition of a limitations period in private antitrust actions.  The first purpose is to limit the public harm incurred by the conspiracy.  See Z Techs. Corp. v. Lubrizol Corp., 753 F.3d 594, 603 (6th Cir. 2014) ("By encouraging parties to bring suits earlier, the statute of limitations attempts to minimize the public harm that might arise from harmful monopolies . . . .").  Permitting parties like the plaintiffs to bring antitrust suits reflects a "congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the . . . prohibited practices."  Rotella v. Wood, 528 U.S. 549, 557 (2000) ("The object . . . is thus not merely to compensate victims but turn them into prosecutors, 'private attorneys general' . . . .").  Because "private suits under the antitrust laws are allowed to correct public wrongs, it is appropriate to encourage suits as soon as possible to stop (or at least compensate) harm to the public."  Midwestern Mach., 392 F.3d at 272.  Congress did not intend for plaintiffs to sit back, with full knowledge of the 2008 conspiracy, and wait six years before finally correcting a public harm.[6]  See Rotella, 528 U.S. at 559 (describing the antitrust enforcement scheme as "aimed at rewarding the swift who undertake litigation in the public good").

Beyond a concern for limiting public harm, a limitations period also provides repose to defendants and avoids the unnecessary defense of stale claims.  The

---

[6]The majority opinion offers this small comfort to defendants:  a plaintiff cannot recover for injuries suffered outside the four-year limitations period.  But I see nothing in this opinion preventing a new lawsuit against the defendants four (or 40) years from now so long as fill levels remain at 15 pounds, even if price fluctuates.  Small comfort indeed.

antitrust limitations period provides finality and certainty to business transactions. 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320a, at 325 (4th ed. 2014). It saves defendants from the specter of perpetual litigation. And the need for timely prosecution of claims is especially great in antitrust law. "Antitrust liability depends not only on the parties' acts but also on many surrounding circumstances, including the behavior of rival firms and general market conditions—matters that may be hard to reconstruct long afterwards." Id. at 326. Allowing suits to be brought many years after the antitrust violation occurred may well deprive defendants the opportunity to present a proper defense.

IV.

In today's opinion, the majority has morphed Klehr into a sledgehammer and then reared that hammer to shatter the antitrust statute of limitations. I do not believe that was the Supreme Court's intent in Klehr, nor do I believe the law permits such a result. I respectfully dissent.

_____